**P. W. CURREY et al., Appellants,**

**v.**

**Ella May INGRAM et al., Appellees.**

**No. 3949.**

Court of Civil Appeals of Texas.

Eastland.

Nov. 5, 1965.

Rehearing Denied Dec. 3, 1965.

Jennings, Montgomery & Dies, Graham, for appellants.

Mock, Banner & McIntosh, Wichita Falls, Jimmy Horany, Archer City, for appellees.

COLLINGS, Justice.

Ella May Ingram, a widow, and her children brought suit against P. W. Currey, Donald Currey, James D. Currey, and Donald E. Brown, doing business as Currey-Brown Oil Company to recover damages for salt water pollution of their land. They alleged that defendants drilled an oil well on their 160 acre tract of land; that production of oil was obtained in January of 1961, but shortly thereafter the well began to produce salt water which defendants first attempted to dispose of in earthen pits and later by injection into subsurface strata. Plaintiffs alleged that defendants were guilty of numerous negligent acts and omissions in the disposal of such salt water which proximately resulted in permanent damage to plaintiffs' real property, loss in value of a herd of sheep and damage to crops growing on the land. Based upon

a jury verdict, judgment was rendered for plaintiffs for $4700.00 on account of damage to their land, and for plaintiffs Richard Mitchell and wife for $1660.00, $300.00 of which was for loss of profit resulting from the salt water damage to the Mitchells' crops and $1360.00 for loss in the value of Mitchells' sheep. The Curreys and Browns have appealed.

Appellants' first eleven points relate to injury and liability for salt water escaping from seismograph holes. The jury found that the defendants failed to cement the injection string in the Currey well before injecting salt water therein, failed to test the injection system to determine that salt water was being disposed of into the 1350 foot level only, prior to use as a salt water disposal well, failed to cap or seal off the seismograph holes on the Ingram property before injecting salt water into the Currey well, that each of said acts or conduct on the part of defendants was negligence and proximately caused the injury and damages sustained by plaintiffs. In appellants' first eleven points it is contended that there is no evidence or alternatively insufficient evidence to support such findings and that such findings are against the great weight and overwhelming preponderance of the evidence.

 It is well settled that under an oil and gas lease the surface estate is servient to the mineral estate for the purpose of the mineral grant. However, it is equally well established that the rights of the lessee under an oil and gas lease must be exercised with due regard to the rights of the surface owners, and that he owes the duty to the owner of the surface not to negligently injure such estate. General Crude Oil Company v. Aiken, 162 Tex. 104, 344 S.W.2d 668. Appellants concede that there was some salt water damage to appellees' land and property, but contend that appellees have failed to discharge their burden to show the cause of such damage, and particularly have failed to show such dam-

age was caused by any negligence on the part of appellants; that appellees failed to show that the injection of salt water into the Ingram well caused any water to leak from the shot holes and that the water would not have come out of the shot holes except for appellants' failure to cement the injection string; that the evidence considered in its most favorable light to appellees on the question of proximate cause presents no more than a guessing game and does not constitute evidence of probative force in support of the verdict. In our opinion there was ample evidence to support the judgment, and no reversible error is presented in these points.

There was evidence to the effect that at no time prior to the damage to the subject property had there been any salt water pollution thereon; that soon after salt water began to be released from the well pollution and damage became apparent. After much complaint concerning such pollution appellants secured a permit from the Railroad Commission to dispose of the salt water in a stratum 1350 feet below the surface. Appellants then placed 1350 feet of pipe for the injection of salt water inside the large hole, which was about 5,000 feet deep, and began the injection of salt water under a pressure of several thousand pounds per square inch. It is undisputed that appellants did not cement the salt water injection pipe prior to its use in such a manner as to prevent the salt water from rising in the hole to other strata near the surface so that such water could pass into and through such strata and percolate, impregnate and damage the surface and subsurface of appellees' land. It is also undisputed that soon after appellants began their injection through the uncemented pipe salt water began to run, seep and flow from the seismograph holes on appellees' property.

W. C. Sutherland, a consultant petroleum engineer, and a man experienced with the oil industry in that section testified con-

cerning appellants' operations in disposing of the salt water. He stated that in his opinion it would not be a reasonable prudent oil operation to inject water at high pressure for a period of five or six months into the pipe as above indicated without cementing off or squeezing off such injection string. Sutherland further testified that in his opinion "a reasonable prudent oil operator would have cemented or squeezed off the injection string of pipe prior to injecting salt water down the hole under pressure". No qualified witness testified that it would be reasonable or prudent to so inject salt water under pressure without cementing off the injection string.

The evidence indicates, as above stated, that some time in July or August of 1961, appellants began the injection of salt water under pressure into the Currey well without cementing off the injection string. The evidence further shows that in February of 1962, water began to run and percolate out of a double shot hole on the north side of the property and a single shot hole on the south side of such property. The witness Sutherland stated that in his opinion, after visiting the premises and checking the surrounding area, salt water coming out of such shot holes would "have to be a blend of the water and of the same water that was injected into the Currey Oil Company Number 1 disposal." He stated that in his opinion the source of the water coming out of such shot holes was from the Currey Oil Company Number 1 well. This constitutes some evidence supporting the finding that the action of appellants in injecting salt water into their well through a pipe which had not first been properly cemented constituted negligence proximately causing the damages sustained by appellees. Considering the record as a whole we also find that the, evidence is sufficient to support such findings of negligence and proximate cause and that such findings are not against the great weight and preponderance of the

evidence. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

■ Appellants particularly complain of appellees' claim and the jury findings that appellants were guilty of negligence proximately causing the alleged damages by reason of their failure to "tap or seal off the seismograph holes before the injection of salt water into their well." Appellants point out that they did not make the shot holes; that such holes were made by a prior owner of the oil leasehold interest and that appellees were paid for shot hole damages at the time the seismic work was done in 1959. Appellants urge that they had no way of locating the shot holes in the cultivated portion of appellees' land and that after the passage of time it was seldom possible to identify a shot hole in pasture land. It is undisputed, however, that appellants knew the land had been "shot" by a Gulf crew and knew of the existence of such shot holes. Appellants' negligent failure to cement the injection string in the Currey well before injecting salt water therein is well established by the evidence and jury findings and rendered appellants liable for all damages proximately resulting therefrom. The evidence in our opinion supports the conclusion that the salt water coming from the shot holes was from the Currey well, into which it had been injected under enormous pressure, and that its presence in the shot holes was the result of appellants' failure to cement the salt water injection pipe so that it would prevent such water from rising in the hole to other strata near the surface, passing into, impregnating and polluting same and then to pass into and rise in the shot holes to cause still more damage. Assuming that appellants are correct in their contention that the findings of negligence because of their failure to "tap or seal off" the seismograph holes are without support, appellants' knowledge of the existence of such holes raised a question of fact concerning whether they should have foreseen the shot hole damage resulting to appellees'

land by the injection of salt water into their well in the manner shown by the evidence. The error, if any, in connection with the finding that appellants were negligent in failing to "tap or seal off" the shot holes is not reversible.

◼ Appellants' 12th through 29th points relate to injury because of salt water escaping from the burn pit and from surface equipment installations. The Currey well, the burn pit and other facilities used in connection with the oil produced on the Ingram property are all located on a water shed or drainage area leading into appellees' large stock tank. The oil well is near the high point of the property and there is a gradual slope downward going north from the well. The salt water from the well was disposed of into the small burn pit which was down hill from and about 150 feet north of the well and in porous ground. It was found by the jury that appellants failed to have adequate walls or dikes around the burn pit, that such failure was negligence and a proximate cause of the injury to appellees' property; that the failure of appellants to line their burn pit was negligence and a proximate cause of the injury to appellees' property; that the construction and location of appellants' burn pit on appellees' property was negligence and a proximate cause of the injury to appellees' property; that the manner in which appellants maintained their injection equipment was negligence and a proximate cause of the injury to appellees' property; that appellants disposed of salt water from their well in such manner as to pollute appellees' property and such action was a proximate cause of the damage to appellees' property. Appellants urge points contending that there is no evidence to support any of these findings or alternatively that the evidence was insufficient and that such findings are against the great weight and overwhelming preponderance of the evidence. In our opinion these points are not well taken.

Several witnesses testified to facts relevant to a determination of the above issues. Appellee, Richard Mitchell, testified that salt water which comes from the well into the burn pit would seep out of the burn pit through gravel "which was connected to the tank" and then drain down across the pasture killing grass land and proceed into and contaminate appellees' water tank; that when salt water would get loose at the well, even though it was not enough to overflow the dike, the rocky gravelly condition of the soil permitted it to go through the dike and on down the incline toward appellees' stock tank. Appellee, Mrs. Jolene Mitchell, testified that appellants ran their salt water into the burn pit and that she never saw them do anything to the burn pit to make it suitable for holding the salt water; that salt water in the pit sometimes ran over or overflowed the pit; that this happened on several occasions and when it did the ground around the pit would be saturated with such salt water and that it would run down the hill. She stated that more and more area was being wasted or used, and contaminated by salt water seeping out of the burn pit and overflowing therefrom. She stated that she protested to appellants concerning such use of the property.

The witness Sutherland testified concerning the injury from salt water escaping from the burn pit and from surface equipment installations. He stated that the burn pit was not built on level ground but was cut into the side of a hill which falls off north of the well. Sutherland stated that in his opinion such a location of the burn pit caused the lower side of the dike to catch the primary weight of the water and seepage and that it "is rather easy for it to seep through the dike going down hill to the west and north." The witness stated the opinion there would be more salt water contamination to the surrounding area from a tank that was so situated on the side of a hill than one that was on level ground. Sutherland stated that in his opin-

ion it was not a prudent operation "to construct a burn tank;" that it would not be reasonable, prudent oil operation to build and use the burn pit as constructed on the Ingram property in disposing of salt water for a period of four or five months. Sutherland further testified that because of the nature of the top soil at the site of the burn pit, it would in his opinion not be reasonable prudent operation to put salt water into the burn pit constructed and located as was the Ingram's or the Currey burn pit on the Ingram property, without either treating the pit or lining it in some manner to keep it from seeping salt water.

There was also evidence to the effect that various lines, fittings and the pump used by appellants overflowed, broke, leaked or sprayed salt water on appellees' land. Appellee Richard Mitchell testified that the salt water injection system including pipes, packing and the pump leaked salt water frequently, about once or twice a week, in substantial quantities and sometimes would "spray out" over the ground; that as a result the surface of the land would turn white and all vegetation thereon would die; that on some occasions the equipment of the salt water injection system would fail and salt water would run into the pit where it would seep out or run over and damage appellees' land. This evidence supports the findings of the jury that appellants were guilty of negligence in maintaining their equipment in such a manner that it frequently leaked salt water.

We overrule appellants' points 12 through 29 urging that there was no evidence, or insufficient evidence to support the findings there complained of. We also hold, after an examination of all the evidence, that such findings are not against the great weight and preponderance of the evidence.

■ Appellants' points 30 through 35 complain of the action of the court in granting the Mitchells' judgment for the loss of sheep. We overrule appellants' contention that the evidence shows the Mitchells were guilty of contributory negligence as a matter of law in failing to protect their sheep. Appellants also contend that there is no evidence or in the alternative insufficient evidence to show that appellants' negligence, if any, proximately caused any injury to the sheep, and in any event the findings to that effect are against the great weight and preponderance of the evidence.

■ It is well settled that an oil and gas lessee is liable in damages for negligent operations causing the death of livestock. Humble Pipe Line Co. v. Day, Tex.Civ. App., 172 S.W.2d 356 (Error Refused). The record shows that because of appellants' negligent operations salt water from the Currey well polluted the stock tank on appellees' land and that Mitchells' sheep drank water from such tank. The Mitchells alleged that the loss of value in their flock of sheep because of death, loss of weight and barrenness as a result of drinking the polluted water was in the sum of $4,000.00. The jury found that the drinking of such polluted water resulted in a loss in value of the sheep in the amount of $1360.00. Mitchell testified that after the salt water began to flow into the stock tank from which his sheep drank they began to die; that they would come in from the field, would sometimes get as far as the barn and sometimes would barely get out of the stock tank and "would just lay down and die." He stated that he lost five or six sheep in this manner in 1962, and also lost some in 1963; that the sheep which did not die did not do well, that they "wouldn't gain weight and grow off like they ought to", and would also lose weight; that his lamb crop in 1962 and 1963 was down from what it had been in preceding years; that in 1963 he finally sold all the sheep he had left after the others had died, and since then has had no sheep on the premises. He stated that the loss in value of his sheep either through

death, loss of weight and barrenness as a result of drinking such salty water has been heavy; that it would run "around three to four thousand dollars."

In our opinion there was ample pleadings and evidence showing that appellants' negligence in the disposal of salt water from their well resulted in the pollution of the stock tank in question, and that such negligence proximately caused the damage to the Mitchells' sheep. We overrule appellants' contention that there was no pleadings, no evidence or insufficient evidence to support such findings and that such findings are against the great weight and preponderance of the evidence.

Appellants' points 36 through 45 are related to land damage. The jury found that the salt water which escaped from the Currey burn pit produced damage to the Ingram property as a whole; that the salt water which leaked from the shot holes in question produced damage to the Ingram property as a whole; that the amount of land so damaged was 160 acres; that such damage was not the result of an unavoidable accident and that the amount of land reasonably and necessarily damaged in the operation of the Currey well was 1 acre; that the fair market value of the surface of the Ingram land immediately before the salt water damage was $100.00 per acre or a total of $16,000.00, and that the fair market value of the surface of such land after the salt water damage was $11,200.00.

Several witnesses who were land owners in the community testified that they were familiar with the value of land in the vicinity and were familiar with sales of nearby property. Their testimony concerning the value of the land in question before and after salt water damage amply supports the finding of the jury. These witnesses were competent to testify concerning the value of such land. Breithaupt v. State, Tex.Civ.App., 321 S.W.2d 361 (Ref. N.R.E.); State v. Griffis, Tex.Civ. App., 300 S.W.2d 220; Tennessee Gas Transmission Company v. Dishman, Tex. Civ.App., 303 S.W.2d 471 (Ref. N.R.E.); City of Teague v. Stiles, Tex.Civ.App., 263 S.W.2d 623 (Ref. N.R.E.); Housing Authority of City of Galveston v. Henderson, Tex.Civ.App., 267 S.W.2d 843. We overrule appellants' contention that there was no pleadings, no evidence or at least insufficient evidence that salt water from the burn pit or from the shot holes produced damages to the property as a whole. Texas Pacific Coal & Oil Co. v. Taylor, Tex.Civ. App., 47 S.W.2d 1110; McDaniel Bros. v. Wilson, Tex.Civ.App., 70 S.W.2d 618 (Writ Ref.).

The jury further found that the value of Mitchell's leasehold interest had been reduced by salt water damage, and that the loss of profit sustained by Mitchell directly resulting from salt water damage to the land in question was $300.00. We overrule appellants' points contending that the Mitchells' recovery for the loss of profit because of reduced crops, and the loss sustained in the value of their sheep herd permits a double recovery, that is, a recovery by the owner of the leasehold estate and a recovery by the fee owner of the land. The record shows that the surface lessee, Mitchell, had acquired his surface lease prior to the execution of the mineral deeds held by appellants. Under such circumstances appellant was liable for any injury to Mitchell's growing crops on the land, in addition to their liability for permanent damage thereto. Stephens County v. Mid-Kansas Oil & Gas Company, 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; Cement Gun Co. v. Brooks, Tex.Civ.App., 152 S.W.2d 815, (Error Dismissed.). Mitchell testified in detail concerning his loss of profit because of reduced crops resulting from salt water damage to the land in question. His testimony amply supports the finding of the jury that such loss of profit to his crops amounted to $300.00.

In appellants' 46th point it is contended that the court erred in submitting

the charge because it was erroneous in its entirety, in that, (a) it combines two different transactions, one of which relates to seismograph holes and the other to a burn pit near the producing oil well, (b) that such transactions are separate and distinct and involve distinct causes of action, (c) and that there is no evidence of the market value of Ingram's land before and after either of said transactions considered separate and apart from the market value of such land before and after the other said transaction. This point is not well taken. It is true, as appellants contend, that appellees' claim involves two different transactions. The evidence and the findings of the jury, however, are to the effect that the property was damaged as a whole as a result of each of said transactions. In Landers v. East Texas Salt Water Disposal Company, 151 Tex. 251, 248 S.W.2d 731, it was held where tortious acts of two or more wrongdoers produce an indivisible injury, all of the wrongdoers will be held jointly and severally liable for the entire damage and that the injured party may proceed to judgment against any one separately or against all in one suit. We see no reason why a plaintiff who relies upon two different transactions, which are separate and distinct but the damage from each extends to the property as a whole, should be burdened with a requirement more strict than that applied where there is more than one wrongdoer. The permanent land damage from both transactions relied upon by appellees extended to the land as a whole. The court did not err in failing to group inquiries concerning certain areas of misconduct with issues of negligence and proximate cause and damages so that the damages from each of said transaction could be distinguished from damages occurring by reason of the other.

We have examined all of the appellants' points and they are overruled.

The judgment of the trial court is affirmed.